## PEOPLE *ex rel.* DEL VECCHIO *v.* SUPERVISORS OF KINGS COUNTY.

December, 1867.

Affirming 23 *How. Pr.* 89.

The proprietors of a newspaper, not actually employed by the supervisors to publish the laws, are not, on voluntarily publishing them, or the tax notices, entitled to compensation, even though the highest regular vote in the board was cast in favor of designating their paper for the purpose.

Under *L.* 1845, p. 305, c. 280, the regularity of the supervisors' designation of a newspaper to publish the laws cannot be impeached collaterally.

It is essential to a legal designation that at least three legal ballots be cast, and that one paper have at least two, and another paper at least one. If all the ballots but one are illegal, there is no valid designation.

James R. Del Vecchio applied to the supreme court for a peremptory writ of mandamus commanding the respondents to audit and pay a bill of one hundred and thirty-nine dollars and fifty cents for printing and advertising tax sales in said county. The return to the alternative writ states that the board of supervisors of the county of Kings did not, on August 1, 1860, nor on any other day during said year, designate the Standard (a newspaper published in said county by the relator) as one newspaper to publish and print the laws, as

provided by *L.* 1845, c. 280.   That said board of supervisors, at their annual meeting, held on said August 1, 1860, did appoint two printers to publish the laws of a local and general nature, in two newspapers published in said county of Kings, as provided by chapter 280 of the Laws of 1845; and that the two newspapers so appointed were designated by said board at said meeting as the Brooklyn Daily Eagle and the Brooklyn Daily Times, and that such appointment and designation were made as follows, to wit: That at said meeting of said board of supervisors, a resolution was offered and adopted in these words:—

" *Resolved,* That the board now proceed to ballot for a choice of the newspapers in which shall be published the laws affecting this county, to be passed at the next session of the legislature."

That, upon the passage of said resolution, the chairman of said board appointed two supervisors as tellers to receive the ballots which should be cast.   That a balloting was then had, of which the tellers announced the result as follows, to wit:—

That the number of ballots received was twenty-four, of which twenty-two ballots contained each two names, one contained one name, and one was blank, and the vote was as follows, to wit:

For The Brooklyn Daily Eagle, sixteen votes.

For The Brooklyn Daily Times, fourteen votes.

For The Brookly Evening Star, twelve votes.

For The Brooklyn City News, two votes.

For The Standard, one vote.

For Blank, one vote.

That the ballot containing a single name was for The Standard.

That thereupon a member of said board of supervisors moved that the " Eagle " and " Times " be declared to be the two newspapers designated by said ballots to print and publish the laws affecting said county, which motion was adopted, no opposition thereto appearing on the minutes of said board. That the mode above stated of designating two newspapers for publishing the laws, had been before adopted and made use of

III—36

by said board, and that the newspapers were designated in the same manner the previous year, to wit: At the annual meeting of said board, held on August 2, 1859, the relator, James R. Del Vecchio, being then a supervisor of said county and present at said meeting, and participating and acting as teller in the designating and appointing of two newspapers for the aforesaid purpose and in manner aforesaid. That, in pursuance of the said designation and appointment, made on August 1, 1860, as aforesaid, the comptroller of the State of New York, in or about the month of June, 1861, prepared for the county of Kings, and for publication in said papers, The Brooklyn Daily Eagle and The Brooklyn Daily Times, a notice of the sale of lands for taxes in Kings county, and caused such notice to be published in said newspapers, as required by chapter 427 of Laws of 1855, section 61; and that said newspapers did thereupon publish said notice for the time and in the manner required by said statute; and that thereafter the proprietors of said newspapers did present their bills to said board duly verified; and said board, at a regular meeting thereof, held on August 6, 1861, did audit and order the same to be paid, and the county treasurer of said county did, on August 8 and 9, 1861, pay to the publishers of said newspapers, "Eagle" and "Times," and to each of them, their respective bills of said publication, amounting to the sum of one hundred and thirty-nine dollars and fifty cents, each being for the same services for which payment is now claimed by the relator. That the said comptroller did not, nor did any person for him, prepare for publication, or request or cause to be published, in The Standard, said notice, or any notice of sale of lands for taxes, nor was the relator, nor any of his agents or employees, requested or authorized to publish said notice; and that said notice was, without authority, copied into The Standard from the columns of said "Eagle" and "Times," after the same had been published by them as before stated.

That the same relator did not present his bill and claim for said advertising, to said board of supervisors, until after said bills of the "Eagle" and "Times" had been audited and paid as hereinbefore stated, to wit: not until August 19, 1861, although at the time said bills were presented, audited and

paid, he well knew the fact; nor did he, on said August 1, 1861, or afterward, at any time, object to the payment of said bills, nor claim that he had any demand against said supervisors for said advertising, until said August 19, 1861. Nor did he, at any time previous to said last-mentioned day, claim or pretend that he was appointed printer, or that The Standard was designated or appointed by said board of supervisors as one of the newspapers to publish the laws as required by the statute hereinbefore referred to. That for these reasons the respondents had refused to audit said account of said relator. To this return the relator demurred, thereby admitting all the facts therein stated. Judgment was given for the defendants upon the demurrer.

*The supreme court* held, that although the ballot was irregular, the power was vested in the board of supervisors, and a deviation from the statute, in the mode, did not affect the validity of the appointment, or at least did not entitle the relator to compensation for services voluntarily rendered without request. Reported in 23 *How. Pr.* 89. The relator appealed.

*John H. Bergen*, for the relator, appellant;—Cited People *v.* Supervisors of Seneca Co., 18 *How. Pr.* 461.

*Richard H. Huntley*, for defendants, respondents;—Cited Matter of Mount Morris Square, 2 *Hill*, 14; Striker *v.* Kelly, 7 *Id.* 9; Wiggin *v.* Mayor, &c. of N. Y., 9 *Paige*, 16; Matter of Mohawk & Hudson R. R. Co., 19 *Wend.* 143; People *v.* Cook, 14 *Barb.* 290, 291; S. C., 8 *N. Y.* (4 *Seld.*) 89; People *v.* Supervisors of Chenango, *Id.* 328; *Sedgw. on Stat. & Const. Law*, 368, *et seq.*; People *v.* Supervisors of Ulster, 34 *N. Y.* 268, 272, 273; People *v.* Mayor, &c. of N. Y., 2 *Hill*, 12.

*Philip S. Crooke*, for plaintiff, appellant;—In reply, cited People *ex rel.* Lefever *v.* Board of Supervisors of Ulster Co., 34 *N. Y.* 268; 5 *Abb. Dig.* 85; Striker *v.* Kelly 7 *Hill*, 9;*

---

* Reversed in 2 *Den.* 323. As to the act being imperative, see 24 *N. Y.* 583, 587; 11 *Ohio St.* 190.

Marchant *v.* Langworthy, 6 *Id.* 646; affirmed, 3 *Den.* 526; Livingston *v.* Tanner, 14 *N. Y.* (4 *Kern.*) 67; *Sedgw. on Stat.* 375; People *v.* Supervisors of Albany, 28 *How. Pr.* 25. and cases cited.

BY THE COURT.—DAVIES, J.—It is difficult to see upon what ground the relator can claim compensation for the publication of the notice, issued by the comptroller of the State, and by him directed to be published in two newspapers in the county of Kings, and which were so published. The relator was never employed to publish said notice, and by his demurrer to the return, he admits that said notice was published by him without authority, and copied by him from the columns of the Eagle and Times, after the same had been published by those papers.

Section 61 of chapter 427, *Laws of* 1855, makes it the duty of the comptroller of the State to give notice of certain tax sales, in the manner therein provided, " in the newspapers designated by the boards of supervisors of such counties respectively, to publish the session laws. . . . The boards of supervisors of the respective counties shall audit and pay the expense of such publication." The relator admits that he was never authorized or requested by the comptroller of the State to publish this notice. His action, therefore, was merely voluntary, and created no legal liability upon the board to audit and pay his bill. He was purely a volunteer.

Neither can the relator claim the right to publish the notice in his paper, and to demand compensation therefor, on the ground that he had been appointed one of the printers to print the laws, under the act of 1845. That act directs the boards of supervisors of the several counties of this State, at their annual meetings, to appoint the printers for publishing the laws in their respective counties. It then provides the manner of making the appointment. The board of supervisors of Kings county did proceed to make such appointment, and did appoint and designate two newspapers, printed in said county, to publish said laws. If there was any irregularity in such appointment, or if the relator was appointed, as he claims, he has not selected the proper mode for trying and settling those

questions. The regularity of the appointment of the newspapers designated cannot be thus inquired into collaterally. The relator, if he claimed to have been appointed or designated as one of the newspapers, should have instituted the proper proceedings to have tested that question. He should not have lain by and permitted others to enter upon the discharge of the duties of an office to which he claims to have been appointed, and thus subject the county to expense to such persons for the discharge of those duties.

But it is very clear that the relator, upon the facts stated in the return, never was appointed or designated as one of the printers within the meaning of the act of 1845. It is apparent that the supervisors did not observe the precise directions of the statute. They did designate two newspapers to publish the laws, although not in the manner pointed out. The provision as to the manner may be held directory, if the substance of the act was complied with. The balloting may be regarded as informal, but the resolution of the board declared the result, and that could only be changed by a direct proceeding for that purpose.

Under no view of the facts can the relator claim to have been appointed or designated as one of the papers. It is to be borne in mind that the board were to appoint two printers. To attain this, each supervisor was to vote for one, and the paper having the highest number of votes, and that having the next highest number of votes, " shall be the papers designated for printing the laws." It is thus seen that it was essential to an election, that two papers were to be voted for at the same time. Two were to be chosen, appointed or designated by the same act, and each supervisor was restricted to voting for only one. And it may be conceded that all the ballots having more than one paper named therein were void. It follows, thereforefore, that the only legal ballot cast was for the paper owned by the relator. But one supervisor alone voting could not make the appointment. The act clearly contemplates and requires that more than one vote shall be cast. Two papers are to be appointed by one and the same process. No voter can vote for more than one paper. The paper having the highest number of votes, and the paper having the next highest number of votes, are to be the papers designated for

printing the laws. It follows, therefore, at such an election, that at least three legal ballots must be cast, and that, to make an appointment, one paper must have two, and another paper one. This is the least possible number of legal votes which can be voted to make an appointment in compliance with the provisions of this act. Now, if the relator's position be correct, there was but one legal vote cast at this election. If so, it conclusively follows that no appointment was made at that meeting of the board; and it also clearly follows that the relator or his paper was not appointed or designated. No one of two or more papers received the highest number of votes, and no paper received the next highest number of votes; consequently, no two papers could be designated for printing the laws.

In whatever aspect, therefore, we regard the relator's claim for compensation for publishing the notice in question, we are unable to discover any legal ground for enforcing it.

Without discussing the question whether a mandamus was the proper remedy to compel payment of this demand, we are of the opinion that the judgment refusing to award it was correct, and should be affirmed, with costs.

All the judges concurred, except BOCKES, J., who was absent.

Judgment affirmed, with costs.